Okay, the next case on call is 513-271. People of the state of Illinois v. Dillard. Ready for proceedings. May it please the court. Good afternoon. I'm Chuck Roberts. I'm an attorney from Albany, Illinois. I represent the defendant appellant, Jennifer Dillard. This case involves the application of the Department of State Police regulations on the use of breathalyzer testing equipment. That administrative code section is in our appendix. And it's 20 Illinois Administrative Code Section 1286.310A. And the importance of this case in a larger sense is that what we're talking about is public protection on the one hand versus individual rights on the other hand. The public protection interest is that motorists are subject to a suspension of their driver's license. And drivers who are impaired, who are problem drivers, are removed from the highways on the 46th day following the notice given by the applicable statute, which is paragraph 11-501.1F and G. The defendant has a right to a hearing. And the reason the suspensions don't go into effect immediately, the reason they have 46 days as a waiting period, is because that gives you an opportunity to request a hearing. The hearing should be held within 30 days. And that gives the individual certain rights. This case arises from an argument about what those rights are and how the Department of State Police regulations should be applied. The case involved Mrs. Diller driving home from the bar that she and her husband own, Papa Mike's and Only, Illinois. She was driving down Lafayette Street. And Officer Clark was a block away. He was on South Street. And they both came to the intersection of East Street. Mrs. Diller turned left, which took her vehicle in front of the state police officer's vehicle. Ironically, this is the same thing that happened to Mrs. Diller in 2008 when Officer Clark also stopped her in that vicinity. She was driving the Cadillac Escalade at the time, both in 2008 and in the stop which occurred in this particular case. Well, the officer testified that he ran the plate and found that it was Mrs. Diller and he followed the vehicle. Exhibit E, which was admitted into evidence, is a video recording from the dash cam in the vehicle. And it shows the stop that was made. She was placed under arrest after being given a field sobriety test. It's on that video. The test is on that video, correct? The sobriety test? Okay. The field sobriety tests were done in front of the squad car on that video. Exhibit E, that would be correct. And I would say it appeared she did a pretty good job on the test, but the officer felt like she failed the test. That becomes significant later after the blood test, not blood test, breath test, I'm sorry, shows a rating of 0.289. And I'll get into why that is significant, I think, in the course of this, because a person blowing a 0.289, I don't think is going to do that well on the field sobriety test. The officer chose to place her under arrest, take her back to the Albany City Police Department. At the Albany City Police Department, they have video equipment, and the video from the Albany City Police Department is Exhibit F in this case. That video essentially is one that's taken over the top of the head of the police officer who's sitting at the desk. And he reads the warning notarist to Mrs. Diller on that video, and you can hear and read the words as it goes through the sections. And that's a good thing. But during the 20-minute period while Mrs. Diller is sitting there, they're talking about bond and how much money she'll need to get out. He advises her, you'll need your driver's license and $100 cash. And she goes to her purse and starts drawing money in the form of dollars out of her purse, which she drops on the floor. Now, this was dropped at 10 minutes to the hour. And by the way, it's kind of interesting the way that the video shows the time on the wall on the opposite side of the room so that you can see the 20 minutes does elapse. It's the correct period of time. And you can see that at 10 minutes to the hour and again at 5 minutes to the hour, Mrs. Diller is there with money and she's dropped it. And she goes down to the floor to pick up. Now, Mrs. Diller's driver's license shows that she's only 5'1". And being a person who has less of an arm span than I do, it would take quite a distance for her to go down and be able to pick money up off the floor. You can see that on the video that she disappears from the officer's view. The officer's sitting right across from her at the table, though. Yes, he is. He is. He's sitting right on the other side of the desk. And it's a pretty narrow table. It's about the width of a normal desk, I think. Right. Probably like the one in front of me. So he is in proximity to her. And does her purse remain on the table? I don't... I think it's in her hands, not on the table. I think she has her purse in her hands during that time. And I think it may have been set to the left of her on the floor in the course of her being questioned. But she did have her purse with her. Let me interrupt you. Because you acknowledge in your brief that the test in Illinois is substantial compliance, right? Yes. And so the officer doesn't have to maintain eye contact with this person throughout the period of time under Illinois law. Correct. The Ramos case suggests that peripheral vision is good enough. We're not asking you to overrule that case. Well, I'm not sure what you're asking. You're saying that just because her mouth goes out of view for a few seconds, that that's not substantial compliance? It went out of view for minutes, according to the clock. And there were two separate times. Minutes? How many minutes? I thought somebody said 15 seconds. Yeah. Yeah, 16 seconds. You're saying it was minutes. I think it totaled a minute or two. Now, they were within five minutes of each other. Right. My question, though, was not total. But each time she reached down, it wasn't minutes. It was a matter of seconds, let me put it that way. Well, the clock is going to show exactly how long it was on Exhibit F. I don't remember the exact time periods in that, but it's a matter that clearly she disappears. The state argues that you can see her during this time, but I think that's probably not the case. Let's assume that you can't see her for those few seconds. How is that still not substantial compliance? I mean, she didn't throw up, right? We have no evidence that there was any other liquids or things that she could eat in front of the officer. So I'm trying to figure out why is her leaning down to pick up money off the floor not substantial compliance? Because she may have spit up in her mouth or any number of things like that. She may have, but she didn't. We don't know that. In the case law in Illinois, it doesn't matter if she says she did or she didn't because it's an objective standard. That's why this case is significant. It doesn't matter if she threw up in her mouth or not. So how many seconds do you believe are significant enough to eliminate the substantial compliance test? In other words, if you're only gone five seconds, maybe that's not enough. How many? What circumstances in this case do you believe eliminates the substantial compliance test? The fact that she left his view. Well, part of her wasn't there. The fact that she left his view. I mean, Judge, we're looking for a reasonable application here. We're not asking for a rigid application from the court. But the statute itself just says continuously observe the subject. Right, continuously observe. But, Your Honor, does that mean that if you view the foot of the subject, that you're complying with it? If you had a room where there was a wall, all you could see was the person's foot, if they had their leg crossed. That's not what happened here. I mean, we're sitting across the table like you and I are, and if you lean down to pick up your piece of paper, I'm still seeing you, right? I may not see all of you, 100% of you. Well, I think you need to be able to see the person. It says observe the person. And it could be very easy to set up where you have the chair back a little bit. And if the person doesn't stay in the view, if they get up and try to go out of the view, the officer can say, if you do that again, I'll have to consider this a refusal. Or, if you do that again, I'll have to ask for a blood draw. There are remedies that the officer has in a reasonable interpretation of this statute. But as I understand it, the officer didn't do that. Correct. And so from the officer's objective point of view, he must have thought that he was in compliance with the statute. Would you agree there? I don't know what he thought, Your Honor. He was making the second arrest of the same lady. I mean, it seems like this officer kind of picked on the defendant here. He was, I mean, he started following her for admittedly no reason. And isn't the real issue here the fact that she did fairly well on the sobriety test, and then when she got tested, breath alcohol, she blew such a large amount that nobody could explain that? Yes. That's really ‑‑ That really covers it, because the last part, the 0.289 is up. She should have been 5. It's 3.5 times. 3.5 times, believe it or not. Was there any testimonies when the machine had been inspected and calibrated with the lampule? I don't recall any. Usually that's the evidence you try to get in. I don't recall. The state tries to get in that it was inspected, one person or two people before, and on a certain date, how many dates it was, and you have to inspect it, what, every 30 days? Well, I don't know if that is still ‑‑ I know that, but, I mean, was that evidence ever put in? There was some question as to why it was so high. I just wondered if somebody thought of that. I don't think that that was, in my recollection, something. It's in the record. It may have been in one of the exhibits. But it wasn't a defense. Nobody raised it as a defense. Correct. The machine was not working properly. Correct. And nobody raised probable cause for stop? That was raised. That was raised, but it's not part of this appeal. No. Okay. I'm sorry to interrupt. Go ahead. Thank you. The state made the point that she didn't drop out of you, and they say in their brief that 25% of her body somehow is still there. So she's not completely out of you, just partially? That's the argument the state makes. It's on page two of their brief. She is leaning down, and the top quarter of her body is still above the desk. I don't think that's the case. The top quarter of my body is from here to here, I think. That's my view of the top quarter of my body. Maybe a third. But doesn't the case law say that you don't have to be staring at somebody the entire time? I mean, the Bishop in the Ramos case, they're talking about long periods of time. In Ramos, five minutes. Six minutes. Six minutes. Versus 15 seconds. I mean, that's a huge difference. But in the Ramos case, from what I recall reading it, the officer testified that this time the person was within peripheral view, and you can see what is in your peripheral view. You may not be focused on it, but I don't think the requirement is that you focus on the person. That's not what the administrative code says. It says you have to observe them, continually observe them. And I think the two words, continually observe, have a normal meaning, and that means that. But it doesn't say continuously observe their face. It says the subject. That's correct. And Bishop says that you have to show as measured substantial compliances measured by a variance actually causing an accuracy or prejudice. There is absolutely no prejudice that has been shown to this. I think there is, Your Honor. And what is the prejudice? I mean, nobody has claimed that she vomited or regurgitated or put a mint in her mouth. I mean, you might have an issue of prejudice if there was a contention of that, but there isn't. But the prejudice must be objected. And the prejudice is that the test result of .289 for a breath level, .289 is amazingly hot. Well, I haven't seen the video of the field sobriety. Exhibit E. I haven't seen it yet. It's not a situation where we have a person who's falling down drunk. But does that mean that you're then contesting the validity of the breathalyzer? It does. We're not contesting the validity of it. We're saying that the test result. On the basis that it doesn't comport with the field sobriety. Correct. But it's not in the record. Yeah, I'm not aware of that. Your challenge to the breathalyzer machine is not in the record. Maybe it should have been, but that is not the subject of the appeal. But the result of 0.289 is in the record. And it is clear from exhibit E and F, I believe, that there is no reasonable way that a person three and a half times the legal limit for intoxication is going to be moving around like Mrs. Dillard was moving around. So that is the prejudice that we claim. But assuming that you're correct, the evidence that would have been shown is, as Justice Welch said, you would ask when it was last calibrated, the ampules and all of the other stuff about the machine, the operating manual, the officer's familiarity, et cetera, et cetera. Yes, Your Honor. Even if all those things are done, you still have this result. I mean, the machine may have been tested the day before. Let's say it was. The machine may have been tested the day after. Let's say it was. But on this particular day, for whatever reason, that machine gave us an inordinately high reading. Why? Well, something must have occurred that would cause that. Well, there's also the phenomena that I understand that experts testify to as kind of an ability for people that consume alcohol frequently in large amounts to be able to function at a level that people that don't consume alcohol frequently in large amounts are able to function at. So, I mean, did you have any expert to say that there wasn't any way that she could have passed or she didn't pass the field sobriety, but apparently appear to have passed the field sobriety and still blow that figure? There was no expert testimony in that area in this case. And, really, I'm not familiar with any experts in that area. Thank you. Thank you. On behalf of the public. May it please the court. Whitney Atkins for the People Council. The people submit to you, your honors, that all you need to do to adjudicate this issue is to look at the video. It's as simple as that. If you watch the video, you will see that the defendant leans down on two occasions, once for 15 seconds and once for 16 seconds. I do have a specific recollection of this, and it is in my brief. It was not for minutes. It was for 15 seconds once and for 16 seconds the second time. She does not lean down so far that she is no longer visible from the officer's view. You will see this when you look at the video. She is still within the officer's view. It's very clear from the video that the top quarter of her body is still above the desk. You know, this isn't admissible evidence, but I'm 5'2", one inch taller than the defendant. And if I lean down from a desk-level height, the top quarter of my body will still be above the desk. Ms. Atkins, what about his argument that the breathalyzer issue is a part of this appeal? Do you believe that, or do you believe it's been forfeited? There's a few problems with that. First of all, he offers no explanation as to how the alleged variance would cause the test to be unreliable. Because, again, it's all in the video. As you can see from the video, it's an overhead view, and you can see what she's doing. You can see she didn't eat. You can see she didn't smoke. You can see that she picks up her bills. So, not only is it on the video that she does nothing to thwart the results of the test, but he also does not give an explanation as to how the alleged variance would thwart the results of the test. So, would you answer my question? Do you believe that it's a part of this appeal, or do you believe it's been forfeited? I do not believe it's a part of this appeal for the reason that I just gave and also for some of the reasons that Your Honors mentioned earlier, that while some people may have characterized her behavior in Exhibit E to not be that of someone who would test for 0.289, for various reasons, I cannot speculate that that is true or not true. People react to alcohol in different ways, and we just can't say whether her behavior was atypical or indicated that there was something wrong with the breathalyzer. We just can't say that due to Exhibit E, her behavior in Exhibit E, that there was some malfunction with the breathalyzer. And going back to what you had said earlier, the desk is not particularly wide, and the BAO officer is relatively close to the defendant, just a few feet away. So, again, she was still in his view. He was able to see her. The defendant states that because of her height, her wingspan must be less than two feet, and so therefore he says it strands credulity that she can be seen. But that whole argument is just a distraction from what the video clearly shows. It's all in the video. But the state argues that even if she did drop out of the officer's view as she contends for 15 seconds on two occasions, the variance was inconsequential and it was immaterial, and that the deviation does not constitute noncompliance with the code. Our reviewing courts have determined that substantial compliance is measured by whether any variance actually caused unreliability or pressures the defendant. Again, the video shows that she didn't vomit, she didn't drink, she didn't smoke, she didn't place any foreign substance in her mouth, and she doesn't allege that she did. There's no variance from her that she did that. In the defendant, he said just a minute ago that it doesn't matter whether the defendant put any foreign substance in her mouth, but it does matter. That's exactly how substantial compliance is measured, by whether the variance caused unreliability of the test. The substantial compliance allows for variance. I mean, his argument is basically that there can be no variance, which then there could only be strict compliance, which clearly case law allows for substantial compliance. So just to reiterate, the defendant, while he argues that because the test results were higher than both the defendant and the BAO officer expected them to be, that the reliability of the tests are in question, but he provides no explanation as to how the variance that allegedly occurred could have caused an inaccurate test result. He just makes a blind assertion and doesn't establish a nexus between these two. All you have to do is look at the video. Therefore, people respectfully request that this court confirm the judgment below. If there's no more questions. No questions. Thank you, counsel. Rebuttal. Thank you all. I think the state's argument misses the point. She makes a point of how something subjective can be employed by the court to show that something took place. And I think we left that. That was the decision of Benutti. And that left the station. That train is gone. It's no longer a subjective test of could there have been throwing up in the mouth which caused the blood alcohol level not to be what's shown on the breath test, but to be something different. It's now an objective test under the regulations of the state police. They made the regulations. They wrote them. They're the state police. It's not the Department of Public Health that writes the regulations anymore. And the state police put in their regulation that it would be continuously a view of the person. Continuous observation. So it's simply a test of was there continuous observation or was there not continuous observation. That is the objective test. It doesn't matter if she threw up in her mouth. In fact, if I tried to present evidence that she threw up in her mouth and the state objected that it's not relevant to this test, I think that would probably get sustained because it's not an issue. It's an objective test. It's whether the officer observed it or not. My view of Exhibit F obviously is different than counsel's view. It reminds me of the baseball rule where now they review the umpire's decisions with video and people still disagree after viewing the video. But this much is clear. The officer couldn't see the part of the subject that I think he's supposed to see, and that's her face, her mouth, this particular area. It doesn't say it has to have 20 minutes of continuous view of her face. It's kind of like the infield fly rule, and don't bring that up because I don't understand that either. But the infield fly rule has to have a reasonable interpretation, and that's what it has for the court to look for in this particular case, a reasonable interpretation. It doesn't mean that you ought to be looking at the person's feet. I don't understand what value that would have. You should look at a part of the person that's reasonable. Thank you. Thank you, counsel.